Thank you. May it please the court, Roger Hoffman appearing for appellants Eliodoro Garcia, Jr. and Jonathan Avell. Plaintiffs ask this court to reverse the district court's order and judgment dismissing their complaint and to enter an order reinstating plaintiffs complaint alleging negligence against the government under the Federal Tort Claims Act. Plaintiffs ask this court to rule and hold that the discretionary function exception to the Federal Tort Claims Act does not immunize the government for its liability for the April 6, 2015 event that caused injuries to the appellants. The primary issue on appeal is whether the discretionary function exception to the Federal Tort Claims Act shields the government from liability where government conduct violated controlling mandatory army regulation. The Federal Tort Claims Act confers subject matter jurisdiction on the district courts to hear tort actions against the government arising from the negligence of its employees under circumstances where the United States, if acting as a private citizen, would be liable under the law of the place where the tortious act or omission occurred. In cases where the government is alleged to have committed negligence in their performance of a function such as that performed by a private citizen, rather than one in the fulfillment of a broad policymaking duty, the government is subject to suit. The Federal Tort Claims Act is a remedial statute that should be construed liberally and its exceptions construed narrowly in order to effectuate Congress's intent to compensate individuals injured by government negligence. While a plaintiff bears the initial burden of proving subject matter jurisdiction, which was done in this case with the filing under the Federal Tort Claims Act, it is the government that bears the burden of proving the applicability of any exception, including the discretionary function exception, through more than its own assertions. Somewhat ironically, the purpose of the discretionary function exception to the Federal Tort Claims Act is to prevent judicial second-guessing of administrative and legislative policy and allow decisions through an action in the medium of tort. There is a two-prong analysis to determine whether or not the discretionary function exception applies in any given case. If the first prong is met, there is no further inquiry. If the first prong is not met, there is additional inquiry. The first... Can you go to the regulations? Because there are provisions that seem to mandate clearing the unafforded ordinances for safe access, certainly for maintenance purposes, but there's also the provision that's 4-12, subsection C, that appear to give discretion in terms of frequency and degree of clearances. How do you reconcile those provisions? Thank you, Your Honor. Initially, I would point out that while this is still described as a live fire range, there has not been any live fire activity at the Makua Military Reservation since 2004. The range was cleared. The gentlemen who I represent were told the range was cleared and that it was safe to proceed into area where they were cleaning when the detonation occurred. But to directly answer your question, Your Honor, there's an Army mandate that I've pointed to in our brief, and I believe Everest has also done this, that's under the D.A. PAM 385-63, which expressly prohibits any ambiguity. We're dealing with a live fire range, probably the most dangerous entity we can come into as citizens of the United States. We know that there is live fire activity, and this regulation specifically says that if there's any conflict or if there's any question as to which regulation controls, it is the one regulation that provides the greatest amount of safety to those using the range. Army regulations prohibit ambiguity. And in this case, the District Court recognized the mandates that Your Honor has pointed out to and then created ambiguity and then put the burden on the plaintiffs, not the government, to prove why the discretionary function exception shouldn't apply. So counsel, let me jump in there. It seems to me that if under your reading, then no one would be allowed to clear Brush because you could never ensure safety if anyone was to ever go out to do anything in that range because of the nature of what happened. But where is the line here? Because I look at the regulations, and I know this was argued in the District Court as well. You have that 4-12B, and then you got 4-12-C. And I think C is the problem for you. B is the problem for them. And they're going to have to answer for B, but you're going to have to answer for C. So what is your best response to C? The reality, Your Honor, is that when military brass and cultural practitioners were allowed access to the valley, they were provided explosive ordinance disposal specialist escorts. Any other civilian allowed in that valley received what was required. The government admits in its filing papers, you know what, we simply can't remove UXO. That gives them one option. You can't remove the UXO, the unexploded ordinance, then you must provide the EOD support. And we're sitting here wondering what was different about maintenance workers versus the military brass and the cultural practitioners, keeping in mind that the sole basis for the maintenance was to allow cultural practitioners back into the valley and oftentimes the military brass into the valley. So I can't answer that question why it wasn't done, but when we look at what is the basis, what policy does the Army provide to us to discriminate against maintenance workers when every other individual who's going into the valley gets the support that's required by the Army regulations. So then your argument would be that the mandatory duty that the government violated here was the not providing effectively the guide. That's correct. It's not following its own regulations. We're not dealing with the National Park. We're dealing with a valley that sustained decades of live fire with known ammunition that had not exploded. And the regulations specifically required given the high intensity and likelihood of injury or death to anyone encountering UXO, very specific obligation, provide support. Now what actually happened remains to be seen, simply because we have very limited discovery in this case. But for whatever reason the government chose not to provide the EOD support to our clients and to other maintenance workers is a question that I can't answer. May I jump in here? The way I read the district court's opinion, the court did not address an argument that the government was negligent by failing to provide UXO avoidance support. Was that theory argued to the court and is that theory supported by factual allegations in the complaint? The complaint specifically read that the maintenance workers were told by Army representatives that UXO had been cleared. And so we have relatively uneducated individuals working near minimum wage jobs following a government directed, hey, listen, it's safe to go in there. The court simply found ambiguity where ambiguity didn't exist. The court did not address this argument that you're making right now. Is that correct? I think the court addressed it, but then muddied it with its decision. The court recognized that there was mandatory language to either clear or provide support. But no, you're right. The government didn't step in and say, hey, listen, we could provide you support as the regulation requires, but we're not going to do that because of some interpretation that we're going to follow and expansively read this exception instead of narrowly interpret the exception as it was required to do. So your theory of the case is that they either had to completely clear all ordinance off the land if they're going to let workers come on, or they had to provide an escort. Our theory is that they followed their own regulations. It's their regulation that says you must clear. They now tell us they can't clear, which is probably due to experience of decades of having to clear up live fire ranges around the world. Let me clarify that. Clear as to areas to which access is being granted, right? I mean, I'm assuming that you'll concede they have some level of discretion in terms of clearance of the valley as a whole. I'm assuming. I mean, it's hard to kind of envision the size of the area versus the size of the areas on which access is permitted, but for the valley as a whole, I'm assuming that you'll concede they do have a level of discretion in terms of clearing the other areas. I agree with the court 100%. The issue here is, again, once the human access was allowed into the valley known to be peppered and littered with the government went in, cleared very specific areas for cultural practitioners to have access, and when the cultural practitioners came in, the areas were cleared by the maintenance workers to have that access. EOD support went with the cultural practitioners. And this may not be in the factual record, but I understand that there was actually government brass on the ground in the valley that day with EOD support. So our position is, if you're going clear a path that's, whatever the fact is, if it's three feet wide and 50 yards deep, and you've gone and cleared it, and you've said that it's cleared of UXO, and then in hindsight, you say, listen, we know we told you it was clear of UXO, but it's a factual impossibility to clear any area of UXO. This is the government word, not our word. Then the government has pigeonholed themselves into one option, provide EOD support any time an individual goes into the valley. I think I've exceeded my time, your honors. All right. The requirement to provide the support, which subsection is that? There are several subsections, but if we look at, I don't have the excerpt of the record, but I could quote to the actual section itself. We were looking at 2-12C subsection B that requires personnel authorized access known or suspected to contain an acronym. We'll be fully advised of the potential dangers and safeguards to be followed and escorted by EOD or UXO qualified personnel. All right. Thank you, counsel. I guess we'll hear from Mr. Snorf now. Thank you. Thank you. Good morning. My name is Lowell Snorf on behalf of Everest National. We're going to try to preserve some time for rebuttal if it's possible. Now, Everest is here because it appeals the 42821 dismissal and post-judgment orders against Everest. What Everest wants is a reversal of the dismissal order and the post-judgment orders, in the case vacated and remanded. Now, my first argument deals with the specificity of the Army regulations. What we're dealing with here are not the general operative regulations of 31519, but the impact regulations codified in both 31519 and 38563. You have to remember that 38563 was Chapter 4 of 31519 required compliance with 38563. These are the impact regulations. You have to follow the impact regulations, not the general operative regulations. 31519, 415B deals with impact regulations. There has to be operational range clearance, UXO avoidance, or UXO exports. 359E, another impact regulation, makes the government a workers entering the impact zone. Then you look at 38563, again, the impact regulations. It required posting of fencing or warning signs before access was permitted. Our judge got into that briefly in the oral arguments and in his decision, but there was no fencing or posting in this area. 38563, 2.1, he says, no access to impact range to surface clearance. These regulations are the ones that are on point. These are the impact regulations. This isn't an operational range clearance. Before you let some workers into an impact range, it's got to be cleared out. It's got to be made safe. These regulations... Counsel, if I could just jump in real quick. You're saying then that 412C, which I think the government's hanging its hat in large part on that regulation, you're saying that that's not applicable here because this is an impact area, not an operational range clearance issue? Yes, that's correct. Under the Bidble opinion, if we make a reference that one regulation applies and the impact regulations do apply, we're free and clear from dismissal under 12B1. Now, the B and C sections of 31519C are dealing with operational range clearance. B makes a directive. C provides discretion as to the operational range clearance, but you have to go to the 38563 impact regulations. I cited the district court opinion of the Hammond case, I believe, or Hammond or Rodriguez, where they went over the applicability of 38563. So I think in the first instance, the government does not need its burden under the first Galbert prong because in the oral arguments in the briefs, we made reference that it was possible that the impact regulations governed Newgate's workspace. Now, my second argument is you have to look at the facts of what happened here. On 4615, the government knew range C was an impact range. Now, the glossary of terms in both 31519 and 38563 define an impact range. On 4615, the government knew range C contained UXAs. On 4615, the government knew UXOs were on range C were hidden and could explode at any time. Then we have the fact allegation of 4615, Army Officer Bert Burha set the workers under range C, telling the workers their work safe was free and clear of UXOs when it wasn't. As the cases at pages 24 and 25 of Everest opening briefs say, and I think this is still a law in the Ninth Circuit, bailing to warn of a known defect on the government's land that the government created does not give the government discretionary immunity. Now, that goes back to a case from 1959, the White opinion, but I think it's a lot more on point than, for example, the most recent Lamb opinion. It's a part of those cases, Everest sites, Young versus United States, Kim versus United States, and Wieson versus United States. Again, telling the workers where to cut grass is not a good thing. It's not a good thing. It's not a good thing. Now, what happened is the postural procedure of what happened in the trial court when we tried to amend the complaint. Now, what happened was on 42821, no reason was given by the court why it dismissed Everest's case and closed the case on the same day. This is an extraordinary remedy. This is a 12B1 hearing, or it was a 12B6 hearing, that was never clear. Discovery was still open until 21122. On 51121, Everest filed a 5960 motion and a 1615 post-judgment motion. The 5960 motion requested leave to amend. I requested leave to amend almost seven times in the 5960 motion. The 1615 motion gave the court the new complaint, and that was a fairly complex complaint, making as many allegations under the Army regulations as we could. The court's 51221 order did not consider the 1615 motion to amend. It was included with the 5960 motion. Apparently, it completely ignored that, but in the 5960 motion, we made the allegations six or seven times. On 614, the order said Everest did not present any reason justifying relief, any other relief justifying relief. This is inaccurate. On 51221 and on 61421, there's no indication the court reviewed the amendment complaint, the motion, to see if there's any possibility for reconsideration or any way to save the subject matter jurisdiction. This was wrong. The court's 61421 order denying Everest's motion to reconsider without reviewing the merits of Everest's 1615 motion was an inaccurate amendment. Lastly, the court never said the proposed amendment complaint could not plead subject matter jurisdiction. The court never addressed Everest's 15A rights under Foman v. Davis 371 U.S. 178-1961. Again, what we're asking for, please, is we ask for the 42821 dismissal order to be vacated, the post-trial judgment order to be vacated. Thank you. Thank you very much, counsel. All right, we'll hear from the United States, Ms. Villalon. Good morning, Your Honors. May it please the court. My name is Natalie Moreland-Villalon, appearing on behalf of the United States. Your Honors, the United States are asking for this court. The two prongs for the discretionary function test have been satisfied. And before addressing those two prongs, I'd like to first address the questions that were asked by Your Honor Judge Wardlaw and Your Honor Judge Owens regarding the particular regulation AR 350-19 4-8C. Your Honors, this regulation provides that when access is necessary, the government will clear UXO or provide UXO avoidance support. Judge Wardlaw, you asked if that argument regarding UXO avoidance support had been addressed by the district court. No, it had not. The reason is because plaintiffs and Everest never raised that argument below. Everest and plaintiffs relied on 4-8E and an interpretation of that regulation to suggest that it was the government's mandatory duty to clear UXO. In the government's reply brief to the motion to dismiss, the government raised the or provision or the or language in that discretion or choice. And then the USA also said that UXO avoidance support would invariably encompass the safety-related provisions in the contract solicitation with Newgate, the plaintiff's employer, as well as the provisions in Newgate's safety plan, which the government required Newgate to implement as part of the contract solicitation. Having raised those arguments in its reply brief, the plaintiffs and the intervener, Everest, had the opportunity to make the argument regarding UXO avoidance support, what that means. They failed to do so. Now they've raised it in their opening briefs and the United States has addressed this argument, same as it did in its instance, someone has to escort the Newgate employees onto the property. No, it does not. That provision that the plaintiffs and intervener relied on below and relied on in their briefs does not say anything about UXO avoidance support. I apologize. It does not say anything about EOD escorts or EOD personnel escorts. But now, before this court, during oral argument, they're raising other regulations that they think could apply that provide that EOD escort assistance must be provided. However, those regulations prove, because they have that specific terminology, EOD escorts, they prove that 4-8E does not require it. Or they prove that 4-8E's meaning of UXO avoidance support is sufficiently broad to confer discretion upon the government to determine what levels of EOD or UXO avoidance support is appropriate under the circumstances for their particular persons who are entering the property. So, for example, if it is an EOD expert who is there to help remove or clear the UXO, the UXO avoidance support that they would have is embedded within their own training and knowledge. If it's someone who's a cultural practitioner who's entering for the first time, it may involve some additional support, including a UXO removal escort. When it is a contractor who the United States has specifically contracted with in order to provide ground maintenance support and specifically put in their contract solicitation hazard, performing the contracted duties will involve exposure to a provision that says that the contractor will ensure that it schedules UXO avoidance training with the range control office. When the contract requires a safety plan to be implemented, when it requires the contractor to be responsible for supervising the safety practices of its own is necessary, what this all shows is that the regulation that the plaintiffs and the intervener have been relying on throughout this case confers discretion on the Army to determine what levels of UXO avoidance support are appropriate. Also, there's an allegation that the Army representative represented to the plaintiffs that the area was, in fact, cleared before they went in to do maintenance when, in fact, it wasn't. Why doesn't that theory survive? Your Honor, the allegation that a maintenance worker indicated that the area was cleared, the government would submit that that appears to fall under the misrepresentation exception to the FTCA. They're alleging that because he represented that those see it from the contract that Newgate was fully aware that these areas were dangerous, that UXO can emerge at any time. Is it your argument that that's not a negligence theory? It's not viable because it's not a negligence theory? Yes, Your Honor. It appears to be a misrepresentation theory. I just want to clarify the scope of the government's argument. I take it that you're very reliant on 4-12C, which appears to give the discretion in terms of the frequency of clearances, but is it the policy that even on areas to which maintenance workers have access or Native Hawaiians have access for cultural rights and practices, that there would not be an expert to accompany them? To the extent that UXOs haven't been cleared, there wouldn't be anybody accompanying them? Your Honor, with regard to the 4-12C, the government relies on this provision to demonstrate why the decisions regarding the clearance of UXO and the frequency and degree of clearance of UXO is absolutely discretionary and why it's entitled to the Galbert presumption under the second prong of the discretionary function exception test. That's for one element or one side of what the plaintiffs and have argued below. The government has had to respond to brand new arguments on appeal. When it comes to the UXO avoidance support argument, 4-12C doesn't appear to address that particular issue. That's why I'm trying to clarify what the government's position is, because I think one way to read all these seemingly conflicting provisions is to read the subsection C section that's being brought to basically confer on the government pretty wide discretion in clearing different areas. When it comes to areas to which specific access has been granted, there appears to be different regulations that speak very specifically to that. Those provisions that speak specifically to either impact areas or areas to which the government has provided access for maintenance purposes, for example, there doesn't appear to be the same discretionary language, discretion conferring language. Why can't we construe the provisions that way, broad authority and discretion over clearing the valley as a whole versus specific areas to which the government is granted access? Your Honor, the reason why the court should not read these provisions in that way is because the fact that there's no specific provision that says here is how you provide UXO avoidance support. These are the different ways. The absence of a regulation that specifically says that does not indicate that the decision regarding the providing of UXO avoidance support was not discretionary. So the government, because UXO avoidance support and those specific terms have not been defined in the glossary for these regulations, in any other regulation, the government submits that the broad terms UXO avoidance support is precisely what conferred discretion on the Army to make the determination of what different levels of UXO avoidance support is appropriate for different people who require access to specific parts of the land. So is it your argument here that it could delegate the providing support to the contractor, basically, that the contractor was supposed to have taken on that obligation, in your theory? In a sense, Your Honor, the creation of the contract itself and the inclusion of specific provisions that do require the contractor to supervise its employees, to provide the briefing regarding UXO avoidance, for the provision in the contract, the full page of the safety plan that specifically provides procedures that employees must follow when they encounter an unexploded ordinance and all of the support that the range support office will provide in those instances, those all count as UXO avoidance support. What I hear you saying is that No, Your Honor. I am not saying that. And who was their support? The training that they received? Is that their support? Yes, Your Honor, the training that they received, as well as the supervision from their employer, who is responsible for supervising and ensuring that the practices that their employees are following are safe. This goes back, really, and Your Honor, I understand that this is a terrible and tragic situation where there are people who encountered an unexploded ordinance on Army property, and I'm not arguing that that should be minimized. The issue, however, is that the Army is in a situation where it must balance safety of not just the Newgate employees, but also the public, and also the cultural practitioners, who the Army is court-ordered to allow access twice a month. Now, what the Army used to do, so the whole reason this contract exists is because of the order that requires access. What the Army used to do is it used to clear the UXO by fire. Once archaeological sites were discovered, it had to stop that. The Army has to balance the safety of its own EOD personnel. Now, there are entire Army regulations that address the safe disposal of UXO. As Judge Owen said, if these regulations barred anyone from entering land that's suspected to have UXO, then no one could enter. You would have to light a fire in order to clear it. We can't do that here. This is a very precious piece of cultural property, as well as an important military range. This is a place that people must access pursuant to a court order that the Army is required to follow. The Army had the discretion here to put out a contract solicitation, find an experienced contractor who is willing to take on the responsibilities of supervising its employees, making sure that they understood the dangerous part of this job. The plaintiffs and the intervener have repeatedly acknowledged this is a well-known dangerous place. It's very well known that there are unexploded ordinances on the property. There's no denying that. Let me ask you a follow-up question. You had indicated that in determining the UXO avoidance support, there's a range of choices that the military can make in terms of what level of support is necessary. Because of that, that confers discretion on the military. Did I get that right? That has to be grounded in policy considerations. What policy considerations are there in determining what level of UXO avoidance support to provide? Or is that more akin to the tree rating system in the Kim case that really involves on technical choices made by experts rather than policy considerations? Your Honor, this relies on a number of policy considerations. I'll start with just the contractors. There's a provision in the contract that prohibits the Army from supervising the employees. That's one. Another is we acknowledge budgetary concerns. EOD experts and EOD avoidance personnel are incredibly costly to bring onto the property. If the court reviewed the full excerpts of record here, including the parts of the record that the district court did not consider, one of their witnesses suggested that the Army should have been including even more EOD avoidance personnel whenever cultural practitioners entered. Even there, the Army has not been able to provide the amount of EOD personnel that others believe is absolutely necessary or recommended. Another factor that comes into play is safety. Here we have people who enter the property very regularly, these employees. There was one indication in also a part of the record that suggested that these employees had mowed the same exact area 50 times. It's completely inefficient to have EOD sweepers sweep hundreds of acres of property every single time someone enters. Operational impact is another consideration. Safety being one of the policy choices. Safety to the workers or to the avoidance support personnel? The safety must be balanced, Your Honor, between all the personnel who are granted authority to access certain parts of the property. This is one of the quintessential cases where safety must be balanced between competing concerns. This is like the firefighting cases where public safety must be balanced against the firefighter's safety in fighting these fires. Your Honor, another policy consideration that comes into play are environmental considerations and also cultural access considerations for when certain UXO are identified. Your Honor, the government has had to on its feet for most of this case because the plaintiff's arguments have considerably evolved since the very beginning. The plaintiff's emphasized here the burden on the government to show that the discretionary function exception applies. However, it is the plaintiff's burden to show that a particular statute or regulation makes the government's decision non-discretionary. I would like to point out, as I see my time is getting shorter, they emphasize these impact range regulations today. They've argued that those are the regulations that really must control. But the plaintiffs have offered no evidence to show that these impacts or MACUA and this particular area was designated by the Army as an impact range. The definitions show that to be an impact range, it must be designated as such. There's nothing in the record to indicate that it has been designated an impact range. With the record before this court today, it is clear that the regulation that applies is 4-8E of AR 35019, where instead of providing a regulation regarding access to impact ranges, it says access to areas known or suspected to contain UXO. That is what MACUA range is. It is known to contain UXO and the areas that were entered have been and really always will be suspected to contain UXO. Another point to remember, the provision that the 2-1E also indicated that surface clearance must be done in these areas. Now the Army has practiced surface clearance of MACUA regularly since the 1950s and that was acknowledged in the plaintiffs and intervenors brief. Surface clearance does not already have been surface cleared. MACUA has had almost a century now of practice being a live fire range. In Hawaii, there's erosion, weather factors, all of these things make surface clearance not a full guarantee that UXO won't be in a particular location. Your Honors, if there are no further questions, I thank the court and respectfully request that the judgment be affirmed. Thank you. All right. Thank you, Counsel. I think Counsel on the other side has some rebuttal time. Thank you, Your Honors. One issue is procedural. This case was judged on a 12B1 motion where the looked at the four corners of the plaintiff's complaint. As you've heard from both sides, it sounds like we're arguing a 12B6 and that was not what was appealed to this court. So from a procedural standpoint, in order to develop a robust understanding of the facts and how the law applies, one of the remedies this court can do is send this back down, allow the two appellants to file an amended complaint and have this court, this case heard on a robust set of facts. Something the government probably doesn't want, but it needs to happen. I think primarily we all recognize that the discretionary function exception fails on a first prong analysis. This case is a lot like the Navarette versus U.S. case, as we said, 500 F3D 914, which is a significant drop-off. The park rangers were required to either post a sign or put up fencing, and they did neither. And the Ninth Circuit dismissed that case, holding that the first prong applied and that the discretionary function exception wasn't available to the government because of the mandatory language post or fence. In this case, we are learning again that it is clearly impossible not only to get UXO out of the entire military range, but the same path, probably as wise as we all walked in here into the gallery, where the government can tell us that this path has been cleared, who wants to have a picnic in this path with me later today? No one who has a brain that works properly. Unless you have UXO support, you cannot be sure, according to the government, that any path or any parcel of land or any square footage of land in that valley is safe to walk upon. It hearkens me back... So when you say that we should send it back for litigation on a more robust record, what do you mean by that? Are you saying on the First Amendment complaint to run another 12b6? Because the regulations don't change, and in fairness to the government, the theories and citations, the various provisions have definitely shifted during the course of the litigation. We have heard by the government's argument that cultural practitioners may have support. We don't know that. That's a disputed fact, because we're told that they always have support. We are told by the maintenance workers that everybody, as a civilian, and this is not a park open to the public. This is a closed government range where access is strictly limited. And those who are allowed in have EOD support. So just to clarify, you're saying it needs to get past 12b6 for discovery? I'm not saying that. That's an alternate remedy, Your Honor. I'm saying that as a matter of law, the discretionary function exception doesn't apply even under the bare bones complaint that we filed, because there is only one option for the government, and that is to provide EOD support to civilians while on the property. Now, if the government can't handle that, to me it's disparate to treat a cultural practitioner and military brass different than our maintenance workers. And there hasn't been an argument to support why maintenance workers don't get the same treatment that the government regulation requires. Well, if you're asking, you're asking that we remand so that you could, for you to, so that the district court could consider both Everest and yours. Motions for leave to amend your complaint, how would you amend it? I would certainly amend it by having additional facts that we've, that both sides have brought out into the record, both below and today. But I, my primary argument to the court is we shouldn't get there because I don't think that the DFE makes it under a first-prong analysis. Under a second-prong analysis, the government hasn't espoused a social or economic or political policy that requires different treatment for the maintenance workers than you do for the government brass and the cultural practitioners. It's that narrow of an issue. Thank you for your time. All right, thank you, counsel. Everest National Insurance Company versus the United States is submitted.
judges: WARDLAW, NGUYEN, OWENS